```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X

UNITED STATES OF AMERICA         :      08 CR. 84 (DC)

       - v. -                    :

Jason Smith,                     :

              Defendant.         :

---------------------------------X
```

### DEFENDANT JASON SMITH'S MOTION TO PRECLUDE EXPERT TESTIMONY CONCERNING THE DIFFICULTY OF OBTAINING FINGERPRINTS FROM FIREARMS

```
                    LEONARD F. JOY, ESQ.
                    Federal Defenders of New York
                    Attorney for Defendant
                    JASON SMITH
                    52 Duane Street - 10th Floor
                    New York, New York 10007
                    Tel.: (212)417-8734/(718)330-1208


                    FIONA M. DOHERTY
                    DEIRDRE D. VON DORNUM

                            Of Counsel


TO:  MICHAEL J. GARCIA, ESQ.
     United States Attorney
     Southern District of New York
     One. St. Andrew's Plaza
     New York, New York 10007
     Attn: AMIE N. ELY, ESQ.
           Assistant United States Attorney
```

July 28, 2008


BY ECF AND FACSMILE: (212) 805-7906

Honorable Denny Chin
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:  United States v. Jason Smith
        08 Cr. 84 (DC)

Dear Judge Chin:

    We write on behalf of Jason Smith to move the Court for a ruling precluding the government from eliciting expert testimony as to the "difficulty locating and lifting usable fingerprints from the surface of a firearm." Gov't Expert Notice, attached as Ex. A. Such testimony should be precluded because, in this case, it does not meet the requirements of Federal Rules of Evidence 401 and 702 or the Daubert test for the admissibility of expert testimony.

    The government recently notified the defense of its intention to adduce expert testimony from an unnamed expert, whose qualifications we have not received. See Ex. A. In this case, the firearm was sent for fingerprint analysis "several months" after the defendant was arrested, Gov't Br. of July 25, 2008, at 5. The defense has received a Police Laboratory Analysis Report from the Latent Print Development Unit, dated July 8, 2008, indicating that no latent prints for identification or comparison were found. See Police Laboratory Analysis Report, attached as Ex. B.

    The government has provided no information in its notice to support an argument that the proffered testimony is relevant or reliable, as required for admissibility under Rules 401 and 702 and Daubert. Most significantly, there is no indication what the data sample is upon which the unidentified expert will base his or her testimony that it is difficult to obtain useable fingerprints from a firearm so as to render this testimony

```
Honorable Denny Chin                           July 28, 2008
United States District Judge                   Page 3
Southern District of New York
```

   Re: <u>United States v. Jason Smith</u>
     08 Cr. 84 (DC)

relevant to the particular facts in this case, or that the data sample is based on reliable standards, see <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 594 (1993).  For example, the government gives no indication of (1) the conditions in which the firearms that will serve as the expert's "data points" were found (<u>e.g.</u>, were they found in similar circumstances to this case or do the statistics include firearms found in dumpsters, water or other contaminatory settings); (2) how the firearms in the data pool had been handled by law enforcement (<u>e.g.</u>, with gloves or without, immediately sent for testing or not); (3) whether the firearms were of similar material to the firearm tested in this case; or (4) whether the firearms had a similar finish to the firearm in this case.  The literature in the area of fingerprint recovery makes clear that each of these factors bear significantly on the likelihood of recovering fingerprints. <u>See</u>, e.g., Clive A. Barnum and Darrell R. Klasey, <u>Factors Affecting the Recovery of Latent Prints on Firearms</u>, 47.2 J. Forensic Ident. 140-148 (1997). A generalized opinion about the difficulties of obtaining fingerprints from items made of unspecified materials found in unspecified circumstances and tested after unspecified handling and an unspecified lapse of time is meaningless with respect to any issue in this case.

  There is also no indication as to any controlled studies upon which this expert will rely or whether his or her theories have been subject to any type of scientific testing or peer review.  All of these omissions counsel against admission of this testimony.  <u>See</u> <u>Amorgianos v. National R.R. Passenger Corp.</u>, 303 F.3d 256, 265-67 (2d Cir. 2002).

  While such expert testimony has on occasion been admitted in this district, it usually has been admitted without objection by defense counsel.  For example, I have reviewed expert testimony given by the criminalist, Nagy Bekhit, who analyzed the gun in this case, in a trial before Your Honor.  <u>See</u> Exhibit C, <u>United States v. Apodaca</u>, 04 Cr. 015, Tr. at 108-118.  In that trial, without any objection to admissibility or motion to preclude from defense counsel, Mr. Bekhit gave testimony along the lines of that proposed by the government here that clearly fails to meet the <u>Daubert</u> standard. Mr. Bekhit testified that the percentage of recording of prints on guns in his laboratory is approximately 15% and that in his personal experience prints of value are recovered from guns approximately 5% of the time. Tr. at 117-118.  He further testified that finding prints of value on bullets is

```
Honorable Denny Chin                         July 28, 2008
United States District Judge                 Page 4
Southern District of New York
```

     Re:  United States v. Jason Smith
          08 Cr. 84 (DC)

even rarer. Tr. at 118. Mr. Bekhit provided no information regarding the time period within which these tests had been conducted, the testing methodology that yielded these results (since that methodology has changed over time), the circumstances in which these guns and bullets had been found, the materials these guns and bullets were made of, the length of time between the guns and bullets being recovered and their testing, or the preservation of the guns or bullets by law enforcement. That is, in offering this testimony, the government's expert offered no scientific methodology or indication that the data had been controlled in any way that would make the application of these statistics relevant or reliable as applied to the evidence in this case, in which the government's theory is that our client handled the gun immediately before it was recovered under a car.

     In short, the government has not, and cannot, make a _prima facie_ showing of the admissibility of the proffered expert testimony concerning the infrequency with which prints are found on guns and bullets under Federal Rules of Evidence 401, 702, or _Daubert v. Merrell Dow Pharms., Inc._, 509 U.S. 579 (1993); _see also_ _Kumho Tire Co. v. Carmichael_, 526 U.S. 137, 141,(1999) (requiring a trial judge to perform a "gate-keeping" inquiry into both the relevance and reliability of expert testimony based on technical or other specialized knowledge in addition to testimony based on scientific knowledge).

     The defense has no objection to Mr. Bekhit providing testimony on the examination he conducted in this particular case or his conclusion that no latent prints were found on the items. But it would prejudice the defendant severely to have a government expert testify that it generally is difficult to recover fingerprints from guns, leading the jury to think that the fact Mr. Smith's fingerprints were not found is insignificant, when that testimony appears to be based on anecdotal information collected without any reliable principle or method. Accordingly, the defense respectfully moves to preclude this testimony at trial.

                                      Respectfully submitted,

                                      Fiona M. Doherty
                                      Deirdre D. von Dornum
                                      Asst. Federal Defenders

Honorable Denny Chin                                July 28, 2008
United States District Judge                        Page 5
Southern District of New York

    Re:  United States v. Jason Smith
        08 Cr. 84 (DC)

                            Tel.: (718)330-1208/(212)417-8734

cc:  Amie N. Ely
     Assistant U.S. Attorney
     (via facsimile: (212) 637-2527)

     Jason Smith
     Reg. No. 60717-054
     MCC
     (via U.S. Mail)



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 24, 2008

**By Facscimile**

Deirdre Von Dornum, Esq.
Federal Defenders of New York, Inc.
16 Court Street
Brooklyn, New York 11241

Re:   United States v. Jason Smith,
      08 Cr. 084 (DC)

Dear Ms. Von Dornum:

This letter provides notice that the Government intends to offer expert testimony at trial from Special Agent Walter Kudron of the Bureau of Alcohol, Tobacco and Firearms. Special Agent Kudron is a firearms expert and is expected to testify about the origin and place of manufacture of the firearm he analyzed in connection with the above-referenced matter. In particular, Special Agent Kudron is expected to testify that the firearm recovered in this case is a Hi-Point 9 mm caliber handgun that was manufactured outside the State of New York, and that the ammunition recovered in this case consists of seven 9 mm caliber bullets that were manufactured outside the State of New York. Enclosed is a summary of Special Agent Kudron's qualifications.

The Government also intends to offer expert testimony at trial regarding the recovery of fingerprints from firearms. The expert will testify, generally, about the difficulty locating and lifting usable fingerprints from the surface of a firearm. We will provide a summary of the expert's qualifications when we receive them.

Deirdre D. von Dornum
July 24, 2008
Page 2 of 2

      If you have any objections to the introduction of testimony from these expert witnesses, please advise the Government promptly.

                Very truly yours,

                MICHAEL J. GARCIA
                United States Attorney

By: _____
    Amie N. Ely
    Assistant United States Attorney
    Telephone: (212) 637-2214

Encl.

| | POLICE LABORATORY ANALYSIS REPORT | | Police Lab No. | 08F0179 |
|---|---|---|---|---|
| | | | U.F. 61 No. | 155  Pct. 048 |
| | | | Precinct Voucher No. | N946999 |
| | | | Precinct Voucher No. | |

PAGE 1 OF 1

| LABORATORY CLASSIFICATION | LATENT PRINT DEVELOPMENT UNIT | DATE | 7/8/08 |
|---|---|---|---|

| RECEIVED FROM | DET | LITRELL | 928302 | FIU |
|---|---|---|---|---|
| | RANK | NAME | SHIELD NO. | COMMAND |

ON  1/7/08  THE FOLLOWING ITEMS LISTED BELOW:
    DATE

| Laboratory No. | Identifying Marks | EVIDENCE |
|---|---|---|
| 08F0179 | NB | 1- One Hi-Point 9mm cal. handgun, ser.#P113361 |
| | NB | 2- Four 9mm cal. cartridges |
| | NB | 3- One handgun magazine |

**NYC POLICE DEPARTMENT**
**CRIME LABORATORY**

This document is CERTIFIED and hereby AUTHENTICATED as an exact photocopy of the original record on file. This photocopy was made on

Today's date  7/11/08

I Title _____ NAME _____ tax # _____
Do hereby CERTIFY and AUTHENTICATE this document as a True copy of the original document on file.

Signature _____

RESULTS OF EXAMINATION OR ANALYSIS:

1. The above described evidence was submitted to the Latent Print Development Unit of the Police Laboratory for a latent print examination.
2. No latent prints for identification or comparison were found.

The results are the opinion / interpretation of the examiner.

I hereby certify that I tested / examined / analyzed the above described item(s) and that this report is a true and full copy of the original report made by me.
False statements made herein are punishable as a Class "A" misdemeanor pursuant to section 210.45 of the Penal Law

| CRIM | NAGY BEKRIT | | |
|---|---|---|---|
| RANK | NAME | | SHIELD NO. |

CRIMINALIST / POLICE OFFICER - POLICE LABORATORY

Criminalistics Form 50-B (Revision No. 07-02, Date Eff.11/05/07, Page 1 of 1, Issuing Authority: Director / Deputy Director)    00095

```
                    US ver Vasquez - 4aj6APO1.txt
18          MR. MARRAH:  No, she's not.
19          MS. BROWN:   The signature, your Honor, I think was
20   intended to be redacted.
21          THE COURT:   I don't think so.
22          MR. MARRAH:  That is not my understanding.
23          THE COURT:   That wasn't my understanding.
24          MS. BROWN:   That's fine, your Honor.
25          THE COURT:   OK.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    107
     4AJAAAPO2                Simpson - Redirect
1           MR. MARRAH:  Nothing further.
2           THE COURT:   Recross?
3           MS. BROWN:   Two quick questions, your Honor.
4           THE COURT:   Yes.
5    RECROSS EXAMINATION
6    BY MS. BROWN:
7    Q.  About photographs, you said that the car windows that the
8    front was a lesser tint than the side?
9    A.  Yes, with the window opened, yes.
10   Q.  You didn't take any photographs of how the tinted windows
11   looked on that night, did you?
12   A.  No, ma'am.
13   Q.  And with respect to the imitation pistol that you have been
14   talking about that is a BB gun, right?
15   A.  Yes, as we call it an imitation.
16   Q.  Same thing as BB gun, no difference?
17   A.  That was a Daisy I think.  I believe it was a Daisy BB gun.
18          MS. BROWN:   Nothing else, your Honor.
19          THE COURT:   All right, Ms. Simpson, you play step
20   down.
21          THE WITNESS: Thank you, sir.
22          MR. MARRAH:  The government calls Nagy Bekhit.
23          THE COURT:   Mr. Bekhit, right up here, please.
24   NAGY BEKHIT,
25       called as a witness by the Government,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    108
     4AJAAAPO2                Simpson - Recross
1        having been duly sworn, testified as follows:
2    DIRECT EXAMINATION
3    BY MR. MARRAH:
4    Q.  Good morning, Mr. Bekhit.
5    A.  Good morning to you.
6    Q.  Where do you work?
7    A.  New York City Police Department Forensic Investigation
8    Division.
9    Q.  How long have you been with the Forensic Investigation
10   Division?
11   A.  Since 1991.
12   Q.  What is your current assignment?
13   A.  I am a criminalist.
14   Q.  What does that mean?
15   A.  Criminalist is a person who works with evidence of,
16   forensic evidence comes to his position from crime scenes.
17   Q.  Are you assigned to a particular unit or division as a
18   criminalist?
19   A.  Yes.
20   Q.  What unit is that?
21   A.  The latent print development unit.
22   Q.  How long have you been working in the latent print
                              Page 26
```

```
                    US ver Vasquez - 4aj6APO1.txt
23      development unit?
24      A.   Since 1995.
25      Q.   And where did you work before you came to your current
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```
                                                                        109
```
        4AJAAAPO2                Bekhit - Direct
 1      position?
 2      A.   I was working in the narcotic analysis section in the same
 3      lab.
 4      Q.   And what are your responsibilities in the latent print
 5      development unit?
 6      A.   Receiving evidence come to my position from different crime
 7      scenes, may use optical, chemical or mechanical methods to
 8      develop prints.  If I find any prints I have to photograph it
 9      and send it to the latent print unit for further evaluation and
10      comparison and then I go to the court of law to testify for
11      what I find.
12      Q.   Mr. Bekhit, can you please tell the jury what a latent
13      print is?
14      A.   Latent print is an impression made by the finger or by the
15      palm or even by the bare foot on a surface and it's very hard
16      to see it with our naked eyes.
17      Q.   What other types of fingerprints are there other than
18      latent prints?
19      A.   We have fingerprint which normally they have it on like
20      official papers, the court the thing, courts they have what
21      they call latent prints and latent prints you can see it made
22      by media between the finger and the surface like a glove or
23      grease or something.  You can see it easy.  This is some type
24      of prints.
25      Q.   Are there any other types?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```
                                                                        110
```
        4AJAAAPO2                Bekhit - Direct
 1      A.   Good prints, I mean overlapping prints, smudge prints, this
 2      is things, you know, I mean it's could happen from different
 3      area.
 4      Q.   What type of training do you have in respect to latent
 5      fingerprint identification and development?
 6      A.   I received three months of training by the most senior
 7      person in that unit at that time show me how to do the work to
 8      develop prints on different types of surfaces, reading.  And
 9      after that I attended many seminars and classes and conferences
10      made by lot of experts in the field and from the F.B.I. and
11      other experts from the United States and Canada.
12      Q.   Do you belong to any professional organizations?
13      A.   I am a member of the International Association for
14      Identification.
15      Q.   Over the course of your career how many times have you
16      analyzed evidence for finger prints?
17      A.   Thousands.
18      Q.   Have you tested guns before for latent fingerprints?
19      A.   Yes.
20      Q.   Approximately how many times?
21      A.   A lot, hundreds.
22      Q.   Have you tested bullets before for latent fingerprints?
23      A.   Yes.
24      Q.   Approximately how many times?
25      A.   Thousands.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                              Page 27
```

US ver Vasquez - 4aj6AP01.txt

111

4AJAAAPO2                    Bekhit - Direct
1   Q.  Have you testified as an expert in fingerprint recovery and
2   development?
3   A.  Yes.
4   Q.  How many times have you testified as an expert?
5   A.  Approximately 80 times.
6   Q.  And what court have you testified as an expert in finger
7   print recovery and development?
8   A.  All state and federal courts in New York.
9   Q.  Mr. Bekhit, when a person handles or touches an item will
10  there always be a latent print?
11  A.  No.
12  Q.  What types of environmental factors, are there any that
13  will impact whether you are able to develop and find a latent
14  print?
15  A.  First of all, the surface which you are going to touch, if
16  the surface is smooth it's a better chance to leave a print on
17  it.  If the surface is hard or texture it's going to be hard to
18  leave a print on it.  The humidity affects the prints.  The
19  heat affects the prints.  The storage effects the print and
20  many other -- it's many factors.
21  Q.  Is there anything -- what, if anything, from the person
22  actually leaving the print could affect the ability to recover
23  the print?
24  A.  Some people they don't sweat so if they touch any surface
25  they are not going to leave a print on it and some other people
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

112

4AJAAAPO2                    Bekhit - Direct
1   if they wear gloves, if they touch anything they are not going
2   to leave a print on the surface.
3   Q.  If there was something on the hands would that impact it?
4   A.  If the person sweat a lot still it is not going to leave a
5   good print.
6   Q.  With respect to guns, specifically, what affects your
7   ability to get prints?
8   A.  Leaving a print on the gun is very hard for many reasons.
9   The first reason that the conducive area and the gun is very
10  limited.  Another reason that most of the manufacturer they
11  coat their gun with a special material to prevent the gun from
12  getting rusty and that is affecting the person to leave a print
13  on the surface.  Some people when they keep their gun they keep
14  it in their waists so when you push the gun down in your waist
15  you erase any print or some people they leave it under a
16  mattress and a pillow.  This all affects that leaving a print
17  on a gun.
18  Q.  With respect to bullets, specifically, what affects your
19  ability to get prints?
20  A.  It's harder on a bullet.  To leave a print on a bullet is
21  very hard.
22  Q.  Why is that?
23  A.  The shape of bullet is round and small so normally when a
24  person handles a bullet to put it in a magazine or bullet in a
25  cylinder he role the -- automatically you role the bullet in
                SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

113

4AJAAAPO2                    Bekhit - Direct
1   your hand so it's hard to leave a good print on the bullet.
2   Q.  Mr. Bekhit, what were you asked to do in this case?
3   A.  Trying to find the print on the gun.

```
                     US ver Vasquez - 4aj6AP01.txt
 4              MR. MARRAH: May I approach, your Honor.
 5              THE COURT: Yes.
 6    Q. I've handed you what has been admitted in evidence as
 7    Government Exhibit 1. Do you recognize Government Exhibit 1?
 8    A. Yes.
 9    Q. What is it?
10    A. It's the gun that I tried to lift the prints from it.
11    Q. How can you tell that is the same gun?
12    A. It has my initial on the side. NB stands for my name, Nagy
13    Bekhit. It has the lab number on it too with red marks, if you
14    can see it.
15    Q. What was the condition of the gun when you received it?
16    A. It was in a bag sealed.
17    Q. And do you recall when you received it?
18    A. Can I refer to my notes, sir?
19              THE WITNESS: Your Honor, can I refer to my notes?
20              THE COURT: Yes, if you do not recall.
21              MR. MARRAH: May I approach?
22              THE COURT: Yes.
23              MS. BROWN: May I see what the witness is referring
24    to, your Honor?
25    Q. I am going to show you what is marked as 3505 B. Take a
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                     114
      4AJAAAP02                  Bekhit - Direct
 1    moment to just review that without reading it, without reading
 2    it out loud. Does that refresh your recollection?
 3    A. Yes.
 4    Q. So approximately when did you receive --
 5    A. I received it in August 10, 19 -- I mean, sorry, 2004.
 6    Q. What did you do with Exhibit 1?
 7    A. When I receive it I opened the bag. I checked the gun
 8    first and I take some notes about it and after that I started
 9    doing my analysis on the gun.
10    Q. Can you explain to the jury what the steps are you take to
11    analyze the gun?
12    A. First, I use a very strong light using magnifier glass to
13    see if any prints on gun I can see with a light reflection and
14    I couldn't see anything, so I use a special forensic light to
15    try to see anything I can't see with the regular light and it
16    was nothing. After that I use the cyanoacrylate and this is a
17    very simple way, exactly the same material as the super glue or
18    the crazy glue.
19              We use drops of this super glue. We put on small
20    chamber, is a small dish and we heat up this material and the
21    material evaporates and when it evaporates fingerprints if any
22    fingerprints on the gun, and until that step I looked at the
23    gun it was nothing. So further I use some forensic florescent
24    dyes to enhance the gun or the prints. If anything there
25    spraying that reagent on the gun using a special light, try to
                     SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                                                                     115
      4AJAAAP02                  Bekhit - Direct
 1    view if any prints there and with that it was no prints of
 2    value found on the gun.
 3    Q. Now, does that process do anything to the appearance of the
 4    gun?
 5    A. Excuse me?
 6    Q. Does the process you just described do anything to the
 7    appearance of the gun?
 8    A. No.
```

US ver Vasquez - 4aj6APO1.txt
```
 9   Q.  Does the gun look different after you finish testing it, is
10   there residue?
11   A.  If we use forensic light we might find some residue on it
12   but not with the regular light.
13   Q.  I am saying after you've applied the glue and the chemicals
14   does the gun appear a little different after you've done that?
15   A.  No, it's the same gun.
16   Q.  I understand it is the same gun, but I'm saying is there
17   anything left from your testing that changes the coloring of
18   the gun?
19   A.  The color under regular light is the same.
20   Q.  You said a moment ago 'no prints of value'?
21   A.  Yes.
22   Q.  What do you mean by 'prints of value'?
23   A.  Print of value is means that the print has enough
24   characteristics for comparison.
25   Q.  So what do you mean when you say there are 'no prints of
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    116

```
     4AJAAAPO2                Bekhit - Direct
 1   value'?
 2   A.  It mean that I could find some ridges or some smudge prints
 3   or overlapping prints which has no value for comparison or
 4   identification.
 5           MR. MARRAH:  May I approach, your Honor?
 6           THE COURT:  Yes.
 7   Q.  I am going to show you what's been marked as Government
 8   Exhibit 2.  Do you recognize it?
 9   A.  Yes.
10   Q.  What is it?
11   A.  This is the bullets I analyzed on that date.
12   Q.  How can you tell this is the same bullets?
13   A.  It has my initials on each bullet.  It has ny initial on
14   the seal and lab number.
15   Q.  What condition were those bullets in when you received
16   them?
17   A.  It was the same.
18   Q.  What do you mean by that?
19   A.  It was sealed in a small bag.  This bag it was sealed.  I
20   cut it open from here from the top and after I finished I put
21   it back and I sealed it and show the seal.
22   Q.  What did you do with Government Exhibit 2?
23   A.  Same techniques I used with the gun, four steps.
24   Q.  The same series of tests?
25   A.  Yes.
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    117

```
     4AJAAAPO2                Bekhit - Direct
 1   Q.  What were the results of the tests?
 2   A.  No prints of value found on this bullet.
 3   Q.  So how many guns have you tested for latent fingerprints,
 4   approximately?
 5   A.  In general?
 6   Q.  In general.
 7   A.  I cannot recall the exact number but can I say hundreds.
 8   Q.  How many bullets have you tested for latent fingerprints?
 9   A.  Thousands.
10   Q.  Any attempt being made by your laboratory to determine the
11   number percentage of fingerprints have been found on guns and
12   bullets?
13   A.  The percent of recording of prints on guns approximately 15
```
                              Page 30

```
                        US ver Vasquez - 4aj6APO1.txt
   14   percent.
   15   Q. Now, that study, what types of print were those? Was that
   16   just print of value?
   17   A. This was mixed. Could be prints of value and prints no
   18   value.
   19   Q. If a print is not of value can it be used? What could it
   20   be used for?
   21   A. It's going to be negative. It has no value, so this is not
   22   going to be used for anything.
   23   Q. Based on your personal experience what is the approximate
   24   percentage of time that you find prints of value on guns?
   25   A. With my personal experience I -- it's no more than five
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
                                                                        118
        4AJAAAPO2              Bekhit - Direct
    1   percent of value prints.
    2   Q. Based on your personal experience what is the approximate
    3   percentage of time you find prints of value on bullets?
    4   A. I can say less than that.
    5   Q. When you find no prints of value, does that mean no one's
    6   ever touched the gun?
    7   A. No prints of value that people handle the gun in a
    8   different ways but they left, they don't leave enough
    9   characteristic for identification to know who touched the gun.
   10           MR. MARRAH: Thank you. Nothing further.
   11           THE COURT: Cross?
   12   CROSS-EXAMINATION
   13   BY MS. BROWN:
   14   Q. Good morning, Mr. Bekhit, is it?
   15   A. Yes, ma'am.
   16   Q. Mr. Apodaca's fingerprints were not on the gun, correct?
   17   A. I don't know.
   18   Q. Well, you just told us that you found no prints of value;
   19   is that right?
   20   A. Yes, ma'am.
   21   Q. So that includes Mr. Apodaca's prints not being found by
   22   you on the gun?
   23   A. I couldn't find any of value prints on the gun.
   24   Q. So that you did not identify a print and successfully
   25   compare it to Mr. Apodaca; is that right?
                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300
                                                                        119
        4AJAAAPO2              Bekhit - Cross
    1   A. I do not identify prints, ma'am.
    2   Q. There were -- the bullet, you tested the bullets, right?
    3   A. Yes, ma'am.
    4   Q. No prints of value on the bullets?
    5   A. Yes, ma'am.
    6   Q. No prints that could later be tied to Mr. Apodaca; is that
    7   correct?
    8   A. Yes.
    9   Q. You also tested the shell casings?
   10   A. Yes.
   11   Q. No prints of value on the shell casings?
   12   A. Yes.
   13   Q. And that includes no prints that could be tied to Mr.
   14   Apodaca, right?
   15   A. My job is to lift the prints only. If I get of val prints
   16   I will photograph and to send it to another section to do the
   17   identification. My job is to find a good print or of value
   18   prints or no value prints or no prints at all. No, I don't
                                  Page 31
```